Filed 5/10/22  P. v. Larios CA4/3
(unmodified opinion attached)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>MANUEL LARIOS,<br><br>  Defendant and Appellant. | G060208<br><br>(Super. Ct. No. C1764443)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

It is ordered that the opinion filed on April 22, 2022, be modified in the following particulars:

On page 23, the last paragraph of the opinion is deleted and replaced with the following:

"Splain was the only neutral witness who did not have a material interest in the case.  Additionally, had the trial court excluded Splain's testimony, Krauss would not have been able to testify to the contents of Splain's e-mail or his interview with Splain.  With the introduction of the e-mail's contents, the jury essentially heard the honest and trustworthy clergyman deliver Larios's ostensible confession twice.  Had the trial court

excluded the honest and upright priest's testimony, it was reasonably probable Larios would have received a better result. The judgment must be reversed and the matter remanded to the trial court."

The petition for rehearing is DENIED. This modification does not effect a change in judgment.


O'LEARY, P. J.

WE CONCUR:


MOORE, J.


ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>       v.<br><br>MANUEL LARIOS,<br><br>    Defendant and Appellant. | G060208<br><br>(Super. Ct. No. C1764443)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Santa Clara County, Eric S. Geffon, Judge.  Reversed.

Robert Brownlee for Defendant and Appellant.

Rob Bonta and Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Amit Kurlekar and David H. Rose, Deputy Attorneys General, for Plaintiff and Respondent.

Manuel Larios appeals from a judgment after a jury convicted him of sexual offenses. Larios argues the trial court erred in admitting evidence, and the prosecutor committed misconduct. As we explain below, the court erred by admitting a priest's testimony without determining its probative value and without weighing its probative value, if any, against its prejudicial effect.[1] We reverse the judgment because the court's error resulted in a miscarriage of justice that denied Larios a fair trial.

FACTS[2]

*I. Introduction*

Briefly, the evidence at trial showed the following. While 12-year-old Elsa Doe[3] was living in a 480-square foot, two-bedroom San Jose house (House) with her sister Maria Larios (Maria), Maria's husband Larios, and others from about 1998 to 2000, Larios molested Elsa. At various points over 15 years, Elsa reported the abuse to a school homework aide, her future husband Jonathan N., her mother, and her sisters.

In 2015, Maria learned of Elsa's accusations and confronted Larios. Trying to save his marriage, Larios sought counseling with a priest, first alone and then with Maria. The priest ultimately concluded he was a mandated reporter and spoke with the police. Elsa's accusations divided her family, and some either blamed her for not remaining silent after so many years or did not believe her. Apparently not obtaining the remorse or support she desired, Elsa decided she would "stand up for [herself]" and contacted the police.

---

[1] Because of our conclusion, we need not address Larios's other contentions.

[2] Unfortunately, Larios's appellate counsel failed to include a statement of facts as required by the California Rules of Court. (California Rules of Court, rule 8.204(a)(2)(C).)

[3] At trial, the parties referred to the victim as Elsa Doe. We will refer to her as Elsa.

An information charged Larios with the following: two counts of aggravated sexual assault of a child under 14 years old (Pen. Code, § 269, all further statutory references are to the Penal Code, unless otherwise indicated) (count 1-rape (§ 261, subd. (a)(2) & count 2-sexual penetration by a foreign object (§ 289, subd. (a)); two counts of lewd or lascivious acts on a child by force or fear (§ 288, subd. (b)) (counts 3 & 4); lewd or lascivious act on a child under 14 (§ 288, subd. (a)) (count 5); and three counts of oral copulation by force or fear (former § 288a, subd. (c), renumbered as § 287, subd. (c), by Stats. 2018, ch. 423, § 49) (counts 6, 7 & 8).[4]

## II. Pretrial

Before trial, the prosecution filed motions in limine inter alia seeking to admit the following evidence: Dr. Blake Carmichael's expert testimony on child sexual abuse accommodation syndrome (CSAAS); and Jonathan's testimony concerning Elsa's statements Larios molested her pursuant to the fresh complaint doctrine.

Larios filed a motion in limine and three supplemental motions in limine. Larios sought to exclude evidence pursuant to Evidence Code sections 350 and 352, the federal and California constitutions, and "[w]here noted . . . under the hearsay rule." As relevant here, Larios requested the trial court exclude the following: Father Thomas Splain's testimony pursuant to Evidence Code section 352 because it was of minimal probative value and would confuse the jury and unduly prejudice him; Jonathan's testimony; and Carmichael's testimony. The trial court denied Larios's motions regarding Splain's and Jonathan's testimony, and denied in part and granted in part the motion concerning Carmichael's testimony. We will discuss the court's ruling regarding Splain's testimony more fully below. The prosecution's first witness was Splain, but we recite the facts chronologically.

---

[4] During trial, on the prosecution's motion, the trial court dismissed counts 3, 4, and 5.

*II. Prosecution Evidence*

In January 1998, Elsa moved from Mexico to California. After a brief stay with one sister, she moved to San Jose to live with another sister, 27-year-old Maria, her husband, 26-year-old Larios, and their two children, seven-year-old M.L. and four-year-old D.L.

They lived in a 480-square-foot home that had two bedrooms and one bathroom. Larios and Maria occupied one bedroom. Larios's brother, Martin Larios (Martin), his wife Martha Larios (Martha), and their infant child also lived there and occupied one bedroom. Elsa slept in the living room on a sofa bed with her nieces, but D.L. often slept with her parents.

Not long after Elsa arrived, Larios began to make her feel uncomfortable. He told her that he loved her, he hugged her, and he rubbed her upper arm. Larios made Elsa wear more modest clothes but not his daughters. Elsa's sister, Sandra U., confirmed this. Elsa understood Larios "was the man of the house[,]" and she obeyed the rules and did not complain.

Sometime after Elsa turned 13 years old, Larios began entering the living room at night and rubbing her body. On the first occasion, Elsa was sleeping on her back when she felt Larios's hand touch her breasts over her clothes. Elsa did not move or say anything. On the second occasion, Larios did the same thing. Elsa did not report the touching because she did not think anyone would believe her. She started sleeping on the floor under the pullout portion of the sofa bed.

On the next occasion, Elsa was asleep under the sofa bed. Larios pulled her from under the bed, waking her up. He pulled her pajama bottoms and underpants down and used his fingers to penetrate her vagina. He touched his penis to the lips of her vagina but before he could penetrate her, there was a noise. He got up and went to the bathroom. Elsa felt worthless and did not think anyone would believe her.

6

About a year later, Elsa and her nieces moved into a room that had previously been inaccessible to them. It had a futon bunk bed. On four or five occasions, Elsa would go to her bedroom to go to sleep while Larios remained in the living room with his daughters watching television until they fell asleep. Larios would carry his daughters into their room and put them to bed—D.L. on the top and M.L. on the bottom with Elsa. Larios would pull down Elsa's pajama bottoms and underwear and perform oral sex on her. He used his tongue to penetrate her vagina. Larios would kneel on the bed and masturbate. During one of the occasions, Larios told Elsa "[her] vagina was like [her] sister's." During another occasion, he used his fingers to penetrate her vagina. During these incidents, Elsa did not move or say anything, she was "paralyzed."

At one point, Elsa suggested to Maria that her nieces should go to sleep at the same time she did; Elsa wanted to lock the door. Maria said to leave them with Larios. Elsa occasionally got her nieces to go to sleep at the same time, and she locked the bedroom door. Around this time, Maria and Larios told Elsa they wanted the best for her. Elsa said, "No. He wanted me for him."

Elsa enjoyed school because she was not around Larios. But because of what Larios did to her, she had low self-esteem and did not have many friends.

At the end of her sophomore year, the family moved to Madera for about one year. Larios was home on weekends. Before he left for work on Monday mornings, Larios would rub Elsa's breasts over her clothing while she was in bed.

The family moved back to San Jose and Elsa began her senior year of high school. Larios and Maria allowed her to have a boyfriend, but Elsa did not tell him what Larios did because he and Larios worked together and were friends. At school, Elsa told a homework aide named Rosa that "[Larios] had done things to [her] that were not right." The aide did not ask her any questions, offer to get her help, or call the police. This made Elsa feel like it was not worth discussing.

7

In 2003, Elsa graduated from high school, turned 18 years old that summer, and met her future husband, Jonathan later that year. In May 2004, she and Jonathan moved in together. Before they moved in together, Elsa told Jonathan that Larios molested her because she wanted to be honest with him about the issues she was dealing with. Jonathan confirmed this.

After Elsa moved out, she maintained a relationship with Maria because she considered her a mother and she loved her nieces. Elsa and Jonathan had four daughters. Elsa let Maria babysit her oldest daughter a few times during the day when Larios was at work. When Elsa was in the hospital to deliver her third child, she let her two daughters spend the night at Maria's house because Jonathan and his family were in Fresno visiting his dying grandmother. Elsa never left her children in Larios's sole custody.

At one point, Maria wanted Jonathan to cosign to purchase a home but Elsa refused because she did not want Larios living near her.

In 2010 or 2011, Elsa finally told her mother that Larios molested her. Her mother said, "'You can do nothing about it[]'" and told her to tell Maria. Her mother did not offer her any support, which made her feel "alone."

In 2015, Elsa was on the telephone with Sandra and another sister when Sandra asked her if Larios molested her. Elsa said he had, and Sandra was supportive.

Later, during a telephone call, Elsa told Maria that Larios molested her. Maria told Elsa that she and Larios would come to her house and Elsa could tell her in Larios's presence. Maria and Larios never went to her house.

Elsa's brothers called her to ask what was happening. One brother told her that "[she] should have just stayed quiet," which made her feel that no one cared and made her realize she had to "stand up for [herself]."

In April 2015, 29-year-old Elsa called the police to report Larios molested her. She would never had reported the molestation to the police if Larios admitted what he did to her. Although she was a recipient of Deferred Action for Childhood Arrivals

8

(DACA)—she did not report Larios to the police to improve her immigration status or to obtain a U visa.[5] The family was divided and Elsa had not spoken to Maria since about four years before trial.

Splain, a Roman Catholic priest at a local church, said Mass and gave his homilies in English and Spanish.[6] He also counseled parishioners for a few hours per week. About 40 years earlier, he studied Spanish for two months in Mexico and five months in Bolivia. He worked in Paraguay for two years and had spoken Spanish often.

On April 10, 2015, Larios went to the church office and asked to speak with a priest for counseling. Splain met with 76-year-old Larios in his office. They began talking in Spanish but after a few minutes spoke in English. Splain understood Larios. Larios told Splain the following: "his sister-in-law [Elsa] lived in the house and that she was making some advances to him and it was some kissing and hugging and that the wife reacted to that and kicked him out of the house." Larios did not elaborate on the conduct—he did not mention breasts or intercourse. Splain believed the conduct was recent. Larios asked Splain to help him reunite with his wife. Splain told Larios his wife also needed to come in for counseling.

The following day, Larios and Maria met with Splain in his office. Splain understood both of them. According to Splain's direct testimony, at some point during the conversation, Larios or Maria mentioned "the age of 12" and Splain was under the "impression" the sister-in-law was 12 years old. Larios never denied having inappropriate sexual relations with the sister-in-law. Larios wanted to reconcile with Maria, but she did not.

---

[5] A U visa allows victims of specified crimes (such as rape and sexual assault) and who assist law enforcement to remain in the United States temporarily. (8 U.S.C. § 1101(a)(15)(U); 8 C.F.R. § 214.14 (2022).)

[6] At trial, Splain was wearing his clerical garb, including his "Roman collar."

After the meeting, Splain realized he was a mandated reporter. He called two people, both of whom said he had to pursue the matter. Splain spoke to Detective Daniel Krauss several times. Within one month of his meetings, Splain wrote an e-mail to Krauss detailing the conversations. After his recollection was refreshed with the e-mail, Splain recalled some of the things he wrote in his e-mail.

On cross-examination, Splain agreed the Spanish spoken in Bolivia and Paraguay differed from the Spanish spoken in Mexico. Defense counsel asked Splain whether Maria told him the incident between Larios and Elsa occurred 10 years earlier. Splain said he did not make that assumption. Counsel asked who told him that. Splain replied as follows: "You know, I don't remember. I think there is a little bit of this information I got from . . . Krauss in some of the telephone conversations and discussions that we had afterwards. I think it might have been he who mentioned '12' and not -- that was something I picked up in my conversation with either of them." Splain agreed Larios never said he raped or molested Elsa. Counsel asked whether Splain thought any inappropriate sexual contact occurred only once. Splain answered, "I never made that implication. I -- I think I was assuming that there might have been a couple instances or moments. But that was never said. He never said, 'it happened once.' 'It happened twice.' 'It happened three times.' [¶] But as he spoke, I said this is something that he could have done -- could have happened several times over time." Splain's "impression" was it happened more than once but it was limited to "kissing and petting." In explaining his thought process after the two meetings, Splain stated he was a mandated reporter, not an investigator, and he made "assumptions" and had "strong impressions" based on "some information" that supported those impressions. Splain was surprised his e-mail to Krauss stated he spoke only in Spanish with Larios during their first meeting, which contradicted his direct testimony. He agreed his memory had changed because he was "80 years old and this [was] four or five years ago."

10

Krauss spoke to Splain and received an e-mail from him. As to Splain's e-mail, the prosecutor presented several questions where she would read a portion of the e-mail and ask Krauss if she read it correctly.

As presented, the e-mail stated the following: "'Dear . . . Krauss. I have some information that will be helpful in the case of . . . Larios's suspected sexual abuse of a minor. [¶] . . . [¶] To review briefly, a Mexican male came by my office at our . . . church on the afternoon of Friday, April 10, 2015. [¶] He said his name was [Larios]. We spoke only in Spanish. And he told me that his wife had kicked him out of the house because of sexual contact with his sister-in-law, who, at the time, lived at the house. He admitted that he touched her and kissed her in inappropriate ways but that she had made strong sexual advances towards him. [¶] The impression he made was that the sister-in-law was in her late teens or early 20s, that he wanted -- what he wanted from me was help getting his wife back. The wife was taking the side of her sister. [¶] I suggest -- I suggested that he could arrange a lie detector test in the presence of his wife. He left and later phoned me to make an appointment to meet again, this time with his wife. [¶] . . . [¶] The following day, Saturday, April 11, he returned with his wife, and I got a completely different take on the circumstances. [¶] . . . [¶] The incidents occurred [10] years ago when the wife's sister was 12. The sister was no longer living in the house. The sister had for some time avoided Manuel's wife because of embarrassment. The wife finally confronted her sister and got the story of the alleged abuse. The wife believes the sister. She did not want to take any legal action against [Larios]. She just wants him out of her life. [¶] . . . [¶] Unfortunately, I did not act fast enough to get contact information. It was shortly after they left I realized I was a mandated reporter on this case. [¶] . . . [¶] I did some googling and found a . . . Larios, 43, here in San Jose . . . . I would be out of my league going any further here. I'm sure you have more professional methods of pursuing this case further.'"

11

Krauss interviewed Elsa, Larios, Maria, and Splain. Larios told Krauss that his English was good and he understood "80 percent." Splain told Krauss that Larios said he touched "the breasts and genitals."

Carmichael, a clinical psychologist, testified as an expert on CSAAS. He stated CSAAS did not prove whether abuse happened and all five components were not always present. He described CSAAS's five components—secrecy; helplessness; entrapment and accommodation; delayed disclosure; and retraction. His testimony helped the jury understand why Elsa delayed reporting the incident, her peculiar sleeping habits, and why she continued to see Larios.

### III. Defense Evidence

Larios's landlord testified she rented the 478-square foot home to Larios and Maria and one could hear noises through the walls. She observed Larios with Elsa and other young girls and she never saw him do anything inappropriate.

Martin, Martha, and their daughter lived in the house with Larios and Maria. Neither of them saw Larios do anything inappropriate.

Larios's daughters, M.L. and D.L., testified their parents treated Elsa like a daughter. M.L. and Elsa would sleep on the sofa bed in close proximity to each other. M.L. never saw Larios come into the bedroom in the middle of the night. They never saw him be "overly affectionate" with Elsa.

Larios testified concerning his background and said he had a sixth grade education and worked in construction. Larios and Maria learned that when Elsa first moved to the United States, she was not going to school so they asked her to live with them. Larios and Maria agreed to raise Elsa as their own daughter and tried to apply the same rules to all their children. Maria was responsible for all aspects of the children's lives. Larios had a good relationship with Elsa and did not tell her what to wear. He confirmed Elsa's account of the sleeping arrangements. After the girls moved to the back bedroom, he did not enter their bedroom. When they lived in Madera, he would not enter

12

Elsa's bedroom.  Later, Elsa brought her daughters to their home and Maria babysat them.  When it rained, Larios did not go to work and he stayed home with Elsa's children.

Larios learned about Elsa's accusations from Maria.  Maria told Larios that her mother said Elsa reported that once when Larios was intoxicated he grabbed her inappropriately.  Larios denied this.  Larios wanted to go to Elsa's house and talk to her, but Maria said she would go first.  When Maria called Elsa, Elsa said that if they came, the police would be there, so they did not go.  Later, Maria met Elsa and spoke with her.  Larios told Maria that Elsa's accusation were untrue.  Maria told Larios to leave, and he lived elsewhere for a while.

Larios went to his church to speak with a priest for counseling.  He asked to speak with a Spanish-speaking priest.  In Splain's office, they had a 15-minute conversation entirely in Spanish.  Larios understood about 80 percent of Splain's "broken Spanish."  Larios explained to Splain that he had been accused of inappropriately touching his wife's sister.  Larios denied he touched her sexually.  Larios denied telling Splain that he kissed Elsa passionately.  He told Splain that he embraced Elsa like a daughter and kissed her on the cheek.  Larios denied he told Splain that Elsa made sexual advances toward him.  Splain agreed to meet with Larios and Maria.

At that meeting, Larios again denied Elsa's accusations.  Larios did not remember whether Elsa's age was mentioned.  Splain suggested they take a lie detector test, and Larios agreed.  Larios did not think Splain understood them that well.  At various points, Splain spoke to Maria in English.  About one week later, Maria told Larios he could return home.  Larios denied he ever sexually molested Elsa in any way.

Maria testified concerning Larios and the circumstances under which Elsa came to live with her and Larios.  She and Larios agreed they would raise Elsa like she was their own daughter.  They treated her like they treated their children.  Larios did not tell her what to wear.  Elsa and M.L. would sleep in the living room.  Maria was "a very

13

light sleeper" and would know if Larios got up during the night. She never saw Larios near where the girls were sleeping, and she did not see him enter their bedroom. She never saw Elsa sleeping underneath the sofa bed. Maria denied Elsa ever made the statement, "'[Larios] wants me for himself.'" Maria babysat Elsa's children, and when it rained Larios was home. She trusted Larios with her daughters and Elsa. Elsa never left her children in Larios's sole care.

Maria learned about Elsa's accusation during a telephone conversation with her mother. She confronted Larios, who denied the accusations and said he wanted to speak with Elsa. Maria said to wait because she "wanted to see his reaction." A couple days later, Maria told Larios to leave.

A few days later, Elsa called Maria. When Elsa told Maria that Larios had touched her inappropriately, Maria said, "'I believe you.'" She told Elsa that she believed her "because [she] wanted to investigate more deeply what she had said."

Maria told Elsa they were going to her house because Larios wanted to speak with her. Elsa said he could come, but the police would be there. Maria and Elsa agreed to meet to talk. Larios wanted to go, but Maria would not let him. At the meeting, Maria again told Elsa that she believed her.

Maria agreed to talk to Splain with Larios because she thought Larios would tell a priest the truth. Speaking Spanish, Larios told Splain the accusations. Maria did not think Splain understood and in English told him that her sister accused Larios of touching her when she was 12 years old. Splain suggested Larios take a lie detector test. When Splain asked if the accusation was true, Larios said, "'No, Father.'" Larios seemed honest, and Maria eventually let him return home.

Larios offered the testimony of numerous witnesses, family and friends who testified generally to his good character and they had never seen him exhibit a sexual interest in Elsa or any other child.

14

*IV. Prosecution Rebuttal*

Elsa testified Larios committed all of the offenses when they lived in the House. Elsa explained Larios would get up during the night to use the bathroom and he would touch her. Larios would touch her at night before Maria returned home from work. On one occasion, Maria got up early and saw her sleeping under the sofa bed and asked her what she was doing. Elsa did not respond. As to their telephone call, Elsa stated Maria called her, and she denied stating the police would be there because she had not called the police yet. She said they never came over, and when she called Maria, she said they had to work. Elsa confirmed Maria told her a few times she believed her. Elsa promised Maria she would not report the molestations for the sake of her nieces, but she felt she had to "stand up for [herself]" when family members told her she "'should have just stay[ed] quiet.'" Elsa maintained contact with Maria because she wanted to be there for her nieces. Elsa repeated she did not make the accusations to improve her immigration status. When the prosecutor asked Elsa why she testifying, she said "if I can't stand up for myself . . . , how can I tell [my daughters], 'stand up for yourself.'"

The trial court asked Elsa a number of questions the jurors submitted. As relevant here, the court asked Elsa about her statements sometimes she wore jeans to bed. When the court asked whether she wore anything under or over them, Elsa said she wore jeans and sometimes she would put pajamas on top of them.

*V. Verdicts, New Trial Motion & Sentencing*

The jury convicted Larios of the remaining counts—counts 1, 2, 6, 7, and 8. After the trial court denied Larios's motion for a new trial, the court sentenced Larios to prison for 27 years to life as follows: count 6-six years; count 7-three years; count 8-three years; and count 1-15 years to life. The court imposed a 15-year concurrent sentence on count 2.

DISCUSSION

## I. *Admission of Evidence*

Larios contends the trial court prejudicially erred by admitting Splain's testimony because it failed to perform the required Evidence Code section 352 weighing, and his testimony was inadmissible hearsay, character evidence, and lay opinion. We agree with his first claim, and thus need not address the others.

## A. *Background*

At the hearing on the in limine motions, the prosecutor argued Splain's testimony was "highly relevant" because it was Larios and Maria "confessing to the crime." Larios's trial counsel asserted Splain's testimony was unreliable because it was based on "impressions, assumptions, and presumptions." Counsel added his testimony was unreliable because Splain's memory of the meetings was poor and there was a language barrier. Counsel concluded Splain's testimony was cumulative to Elsa's testimony. The court inquired whether Larios's statements, via Splain, corroborated Elsa's testimony. Counsel repeated Splain's testimony was unreliable and Splain's testimony was cumulative to Elsa's testimony. The prosecutor responded those issues were "fodder for cross-examination" and went to the "weight" of the evidence and "not admissibility."

The trial court ruled as follows: "I'm going to deny the [m]otion to exclude the testimony of . . . Splain. I do think that the issues that are raised certainly go to the weight of the testimony, not its admissibility. [¶] So the jury will be in a position to determine what he heard and whether he can remember and give us anything that's probative. So I'm going to allow his testimony."

16

*B. Law & Analysis*

*1. Was there Error?[7]*

"'No evidence is admissible except relevant evidence.' (Evid. Code, § 350.) 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."' [Citation.]" (*People v. Hardy* (2018) 5 Cal.5th 56, 87 (*Hardy*).) Relevant evidence includes "'evidence relevant to the credibility of a witness or hearsay declarant.' [Citation.]" (*People v. Miles* (2020) 9 Cal.5th 513, 587 (*Miles*).)

"'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.) 'In general, the trial court is vested with wide discretion in determining relevance and in weighing the prejudicial effect of proffered evidence against its probative value. Its rulings will not be overturned on appeal absent an abuse of that discretion.' [Citations.]" (*Hardy, supra,* 5 Cal.5th at p. 87.) An abuse of discretion means the trial court acted in an arbitrary, capricious, or absurd manner that resulted in a manifest miscarriage of justice. (*Miles, supra,* 9 Cal.5th at pp. 587-588.)

"'When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers "substantially outweigh" probative value, the objection must be overruled.' [Citation.]"

---

[7] We invited the parties to submit supplemental letter briefing on this and other issues regarding the preservation of issues on appeal. The parties agree Larios preserved appellate review of this issue because before trial he moved to exclude Splain's testimony on this ground.

17

(*People v. Coddington* (2000) 23 Cal.4th 529, 618, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13.)

A trial court's obligations under Evidence Code section 352 are well settled. "'[A] court need not expressly weigh prejudice against probative value or even expressly state that it has done so, if the record as a whole shows the court was aware of and performed its balancing functions under Evidence Code section 352.' [Citation.]" (*People v. Rivera* (2019) 7 Cal.5th 306, 344; *People v. Mickey* (1991) 54 Cal.3d 612, 656.)

"'All questions of law (including but not limited to questions concerning the construction of statutes and other writings, *the admissibility of evidence*, and other rules of evidence) are to be decided by the court.' (§ 310, subd. (a).)" (*People v. Cottone* (2013) 57 Cal.4th 269, 282, italics added.) The court's legal duty to determine whether to admit or exclude evidence has been described as the "gatekeeper" function, i.e., to attend the gate and control what evidence goes through to the jury. (See *People v. Huynh* (2021) 65 Cal.App.5th 969, 987; *People v. Lund* (2021) 64 Cal.App.5th 1119, 1153 (*Lund*).)

A common argument concerning the admission of evidence is a trial court did not perform the required Evidence Code section 352 weighing on the record. (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1168 (*Villatoro*).) Such an argument is generally based on the trial court's silence, i.e., the court did not *expressly* weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. In such a case, "'[W]e are willing to infer an implicit weighing by the trial court on the basis of record indications *well short* of an express statement.' [Citation.]" (*Ibid.*) In a case where trial counsel filed written motions arguing Evidence Code section 352 and the trial court considered those submissions and heard argument on the issue at the Evidence Code section 402 hearing, we can infer the court was aware of and

performed the required weighing under Evidence Code section 352. (*People v. Rivera* (2019) 7 Cal.5th 306, 344.)

We have a significantly different issue here. Rather than silence from the trial court, the record reflects the court made explicit statements indicating the jury would do the weighing. We must decide whether the court's express statements establish it did not perform the required Evidence Code section 352 weighing. We conclude the court's statements establish it failed to perform its gatekeeper role.

An important requirement of a fair trial is that the trial court only admit *relevant* and *competent* evidence. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 265.) Competent evidence makes for persuasive evidence. Splain's testimony concerning what Larios told him could have been relevant, but only if the trial court would have first established Splain's testimony was competent. Without first determining the competency of Splain's testimony, we cannot determine its persuasiveness, i.e., its probative value. The trial court delegated to the jury the competency requirement in two important respects.

First, the trial court did not determine the foundational facts of Splain's competency regarding his fluency in the Spanish language. Splain testified he would give his homilies in English and Spanish, but he admitted his Spanish language education was minimal and remote. Then 80-year-old Splain stated that 40 years earlier he studied Spanish for a total of seven months, five of those months in Bolivia, and spoke Spanish for two years while working in Paraguay. He admitted the Spanish spoken in those two countries was different than the Spanish spoken in Mexico. Although not directly related to Splain's competency in the Spanish language, but relevant to his ability to clearly recollect, Splain's testimony he spoke to Larios in Spanish and English during the first meeting was contradicted by his e-mail, days or a few weeks later, to Krauss stating he spoke to Larios only in Spanish during that meeting. The *foundational* facts of Splain's competency in the Spanish language were not established. Larios testified that at the first

19

meeting he spoke to Splain entirely in Spanish and described Splain's Spanish as "broken." Testimony suggested that at the second meeting Splain spoke to Maria in English at times. Such uncertainly regarding the language spoken adds to the concerns with the competency of Splain's testimony.

Second, the trial court did not determine the foundational facts of Splain's testimony regarding what Larios told him. Splain was not definitive in what Larios told him and could not provide quotes. Splain testified as to his "impressions" of what Larios told him. These statements would be relevant, *if Larios made them*. But we have no confidence on this record what statements Larios actually made. Splain used language that suggested they were not Larios's words.

We are in no way criticizing Larios. But he testified he had a sixth grade education and worked in construction. Splain attributed to Larios sophisticated words a person of that educational level and employment history would not typically use. For example, Splain testified Larios told him his sister-in-law made "advances" towards him. Additionally, Krauss testified Splain told him that Larios admitted to Splain he touched the victim's "breasts and genitalia." These words are illustrative of a more advanced vocabulary, of a person who benefitted from a complete education, and clearly suggests these were Splain's words, not Larios's. Additionally, then 80-year-old Splain could not remember portions of what Larios and Maria told him, particularly about the victim's age. He admitted confusion as to who told him what, including what he may have learned from Krauss rather than from Larios or Maria.

In light of his failure to remember which language he and Larios spoke, his reliance on assumptions, impressions, and implication, his failure to remember portions of the conversation and who said what, an examination of whether then 80-year-old Splain was suffering from declining mental acumen was appropriate before testifying. Because the trial court failed to determine the foundational facts of Splain's ability to speak Spanish and his ability to recite what Larios actually said, and clarify some rather

20

glaring inconsistencies, Splain's testimony was not competent and lacked persuasiveness. Thus, his testimony had little, if any, probative value.

Assuming for the sake of argument Splain's testimony was competent evidence the trial court failed to perform the required Evidence Code section 352 weighing of prejudice against probative value. The court's comments demonstrate it abdicated its gatekeeper role. After stating the issue was one of weight and not admissibility, the court continued: "So the jury will be in a position to determine what he heard and whether he can remember and *give us anything that's probative*." (Italics added.)

It was not the jury's duty to determine what Splain heard or remembered. It was the court's duty to determine in the first instance whether what Splain heard and remembered was competent and probative evidence. If it was, it was the jury's duty to consider that evidence in determining whether the prosecution carried its burden to prove the charges beyond a reasonable doubt. (CALCRIM No. 220.) When the court stated the jury could determine what Splain heard and what he could remember and then determine the probative value, it demonstrated its confusion in the role of a trial judge. The court was obligated to ensure the jury only received competent evidence, and only after that initial trial court determination was it for the jury to determine the weight to give to the evidence. The prosecutor bore the burden of establishing the admissibility of Splain's testimony. Rather than bear that burden, the prosecutor added to the confusion by making comments regarding the foundational facts being "fodder for cross-examination" and advancing the idea foundational facts were issues of weight, not admissibility.

The trial court's comments establish it not only failed to determine whether Splain's testimony was competent and probative, but it also failed to weigh whatever

21

probative value the evidence had against its prejudicial effect.[8]  "'[U]ndue prejudice is that which "uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues." [Citations.]' [Citation.]  'Evidence is not "unduly prejudicial" under the Evidence Code merely because it strongly implicates a defendant and casts him or her in a bad light, or merely because the defendant contests that evidence and points to allegedly contrary evidence.' [Citation.]"  (*People v. Jones* (2012) 54 Cal.4th 1, 61-62.)

Here, Splain's testimony was unduly prejudicial because it would evoke an emotional bias against Larios while having slight, if any, probative value because of its lack of competence.  It can reasonably be inferred Splain's testimony would evoke an emotional bias premised in part on the fact he was the prosecution's first witness.  The prosecution did not call Elsa to describe what happened.  Instead, the prosecution called the trustworthy priest, complete with clerical garb and Roman collar, to tell the jury Larios essentially first confessed to some sexual contact with a family member and later Larios or Maria disclosed the sexual contact was with a minor.

This was the stuff of movies.  The honest clergyman ascending the witness stand cloaked in the trustworthiness of clerical garb to deliver a parishioner's ostensible confession.  We can think of no more damning evidence.  Based on this record, this testimony was of questionable probative value, it most likely inflamed the jurors' emotions to punish Larios for his offense, and it was unduly prejudicial.  (*People v. Dalton* (2019) 7 Cal.5th 166, 220.)  This is one of the rare cases where the prejudicial effect of the admitted evidence clearly outweighed its probative value because the evidence's competency was suspect.

---

[8]  The Attorney General asserts Larios did not argue Splain's testimony was unduly prejudicial.  To the contrary, he asserted as much in his in limine motion.  And we think he adequately preserved it when he cited to Evidence Code section 352.  We agree though with the Attorney General that Larios's written submissions on appeal and below are not the model of clarity.

Unlike our Supreme Court in *Villatoro, supra,* 54 Cal.4th at page 1168, we are not willing to infer an implicit weighing by the trial court because the court's comments establish it delegated its gatekeeper role to the jury. The court's statements establish its ruling was not informed but was instead "'"a shot in the dark."'" (*Lund, supra,* 64 Cal.App.5th at p. 1154 [nature of discretion requires court's decision be informed and not '"a shot in the dark"'].)

The record here does not demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352, and thus the court failed to conduct its required gatekeeper role. (*People v. Williams* (1997) 16 Cal.4th 153, 213.) Thus, we must determine whether Larios was prejudiced.

*2. Was the Error Prejudicial?*

"It is also well settled that the erroneous admission or exclusion of evidence does not require reversal except where the error or errors caused a miscarriage of justice. (Evid. Code, §§ 353, subd. (b), 354.) '[A] "miscarriage of justice" should be declared only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' (*People v. Watson* (1956) 46 Cal.2d 818, 836 . . . .)" (*People v. Richardson* (2008) 43 Cal.4th 959, 1001, abrogated on other grounds by statutory repeal as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.)

Here, it is reasonably probable that had the trial court excluded Splain's testimony, Larios would have received a more favorable result. As the Attorney General concedes, the case was a credibility contest between Elsa and Larios. There was no physical evidence implicating Larios. Additionally, Elsa did not report alleged inappropriate sexual touching to the police until 15 years later, although she told various people Larios molested her in the intervening years. During that time, Elsa continued to associate with Larios, her brother-in-law, and on various occasions left her children in his

23

home, with her sister. Moreover, the defense elicited testimony Elsa was a DACA recipient whose immigration status may have improved if she were a victim of a crime.

The importance of Splain's testimony in this she said/he said delayed reporting case cannot be overestimated. The Attorney General recognizes, indeed concedes, the devastating nature of Splain's testimony. The Attorney General states the following: "The matter might have remained a somewhat close credibility contest between [Larios] and Elsa. However, shortly after reports surfaced of [Larios's] offenses, he, first alone, and then with his wife Maria, went for counseling to . . . Splain, a priest at [Larios's] church. [Larios's] credibility at trial was destroyed, and Elsa's vindicated, by . . . Splain's testimony about the interviews, and even more forcefully by [Splain's] contemporaneous written memorialization of his interviews with [Larios]." We couldn't have said it better ourselves. In giving his testimony, Splain struck the mortal blow and decimated Larios's defense efforts.

There was little, if any corroboration, near the time of the alleged molestations. Although Elsa testified she reported the molestations to a school "aide named Rosa" who offered her no help, this was in no way corroborated; it was likely Rosa was also a mandated reporter. The other children who were sleeping in the same room with Elsa, one who had slept in the same bed with Elsa, all disputed Elsa's claim Larios came into the bedroom during the night. The significant delay in reporting the molestation and Elsa's willingness to leave her children with Maria in the home she shared with Larios and other factors could have created a reasonable doubt as to Larios's guilt. But none of this evidence could overcome the words from a priest's mouth relaying the defendant's confession.

Splain was the only neutral witness, who did not have a material interest in the case. Additionally, had the trial court excluded Splain's testimony, Krauss would not have been able to testify to the contents of Splain's e-mail or his interview with Splain. With the introduction of the contents of the e-mail, the jury essentially heard the honest

24

and trustworthy clergyman's deliver Larios's ostensible confession twice. Had the trial court excluded the honest and upright priest's testimony, it was reasonably probable Larios would have received a better result. The judgment must be reversed and the matter remanded for the trial court to perform its duties pursuant to the Evidence Code.

## DISPOSITION

The judgment is reversed.

O'LEARY, P. J.

WE CONCUR:

MOORE, J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.